**In re the Marriage of Douglas Van SHANNON and Tonya Norma Shannon.**

**Douglas Van Shannon, Petitioner–Respondent,**

v.

**Tonya Norma Shannon, Respondent–Appellant.**

No. 26876.

Missouri Court of Appeals, Southern District, Division One.

Dec. 30, 2005.

Susan S. Jensen, Springfield, for appellant.

Roy E. Williams, Jr., West Plains, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

This appeal arises from the judgment entered on January 28, 2005, arising from the dissolution of Appellant ("Wife") and Respondent ("Husband"), who were married on February 18, 1983. On January 23, 2003, just shy of their 20th anniversary, Husband and Wife separated; the dissolution was entered on January 28, 2005. Two children were born to the marriage, Nathaniel Douglas Shannon, 21 at the time of the judgment, and Joshua Aaron Shannon, 19 at the time of the judgment.[1] Nathaniel Shannon was attending Ozark Technical College and Joshua Shannon was attending mechanic's school in Nashville, Tennessee; both would be emancipated by July 2005.

By the end of their marriage, Husband was engaged in a profitable trucking business; Husband's tax return for 2003 showed that the trucking business income was $202,821. The financial success allowed Husband and Wife to join with Husband's two brothers and their spouses to purchase a livestock sale barn and build a home on 80 acres in Wright County, which they paid off within eleven years and was valued at $341,000. In addition to their

---

1. Husband adopted Wife's son, Matthew Shane Shannon, who was emancipated at the time of the hearing.

marital home, Husband and Wife acquired another 76 acres in Wright County known as the "Reberry Place," which had a value of $114,000. Husband and Wife rarely carried credit card debt and, if an item was charged on the credit card, it was usually paid off within two months. Husband was able to purchase a new car every two years and, at the time of the proceeding, owned over ten vehicles.

While Husband's business enjoyed financial success, Wife remained in the family home and cared for Husband in every imaginable way. She ran the Husband's bath water every night, washed his hair on many occasions, washed his back, clipped his toenails, and even filed his calluses. Further, Husband was "very particular" about the home, often criticizing Wife's cleaning. Over the twenty years she was married to Husband, Wife was continually discouraged by Husband from working outside the home.

Husband was adamant that he wanted Wife at home and not employed outside the home. Wife was a certified EMT at the time of their marriage, but her license expired because she did not utilize it throughout the marriage. Husband did not feel it was appropriate for Wife to be out in the middle of the night. Until 1989, Wife's social security statements show Wife earned no more than $18 per year. In fact, she was offered a permanent position working in a business office in and around the year 1989, but she declined the offer because Husband would not allow it and argued that he did not want to hire a babysitter. Because she could not accept the permanent position, Wife decided to work for the office in an on-call capacity when someone was needed to sit in the office and answer phones. In the next three years, Wife was only able to earn, in total, $967. Eventually, Wife even gave up that work because each time she worked, Husband became agitated and they argued.

Although Husband did not want Wife to be employed outside the home, he did, beginning in 1990, allow Wife to keep the books for his trucking business. Initially, Wife was not paid in this capacity, but then it was suggested to Husband that he put Wife on his payroll for tax purposes. In that way, it would appear that Husband's company was paying an employee when the money paid to Wife was actually returned to the company after taxes were taken out. This practice did not continue because Husband's mother complained that the practice built up Wife's social security instead of Husband's. Even though she was no longer reported on the payroll and her work as her Husband's bookkeeper was not recognized, Wife continued keeping the books for Husband's business even past the time she and Husband separated. When the sale barn was purchased, Wife ran an attached snack bar at the request of Husband and his brothers. Eventually, she took control of the snack bar and it was owned separately from the sale barn.

Husband testified that one to two years before the separation, he became involved in an affair with a married woman working at the sale barn. Both parties testified that the three years preceding the separation were filled with arguments. Wife testified that in those years Husband had become verbally abusive to her and their sons. Even with the increased agitation and withdrawal on the part of her Husband, Wife was determined to save the marriage. Wife testified that she was afraid Husband did not feel loved, so she tried to accompany Husband more on errands and bestow him with more affection, but this did not work because, as Wife later discovered, of Husband's affair.

Wife's increased attention disrupted time he could spend with his girlfriend.

While no accurate account exists, Husband admitted to spending about $3,000 on his girlfriend. Testimony indicated that he bought his girlfriend jewelry, a motor for her car, phone cards, clothes, and periodically gave her money to cover bad checks or help with financial difficulty. In addition, the girlfriend accompanied Husband with his truck deliveries and they would often stay in hotels in the various states where he traveled. Even with Husband's verbal abuse, detachment, and the separation, Wife was determined to make the marriage work. Wife unequivocally learned after the separation that Husband had been having an affair for at least a year yet she was still willing to try and resolve the issues in their relationship. In contrast, Husband continued with his girlfriend and gave up on the marriage.

Wife was in her early 40s at the time of separation, she had not had any type of real employment outside of the home in close to twenty years. Running the snack bar was the closest experience she had to a real job and the snack bar was sold a few months after she and Husband separated. Although she lacked experience, Wife immediately began working and still is working part-time for an insurance agent in Springfield, Missouri. Wife also began working in another office for a different insurance agent because she needed more hours. Wife's duties include answering the phone, taking messages, quoting insurance, selling casualty and property insurance, endorsing policies, and revising insurance forms. Wife has taken an insurance exam so she can now be considered licensed support staff, but she earns $8.50 an hour and she is only able to work 32 hours a week. With her limited skills, Wife cannot currently find a job where she would earn more than $8.50 an hour. She

plans to move to Springfield at which point she hopes to work full time since she will not have to commute such a long distance.

While the insurance exam she took allows her to sell casualty and property insurance, Wife is not considered an insurance agent. In order to be an insurance agent, Wife would need to obtain at least an associate college degree or the equivalent in experience and she would need to take another exam in order to obtain both life and health licenses. Even if Wife succeeded in obtaining an associate college degree and life and health licenses, which would take at the very least two years and most likely more, Wife would still need to be approved by an insurance company in order to become an agent. Wife has never attended college, and, given that she has to work, she testified that she would not be able to attend college on a full-time basis.

When questioned on the possibility of attending college, Wife answered, "It scares me, I'm a little old." Wife testified she was dependent on Husband and so hopeful that she could reunite with Husband that she had not taken any classes since the separation because she felt, if and when she and Husband resolved their issues, Husband would not approve of her attending college. Additionally, Wife did not pursue her education during the separation because "she was in a state of limbo" not knowing what the outcome of the separation would be. Wife was frustrated in her situation because she had been out of the work force for so long and stated, "I haven't been in the work force in twenty years, I am literally a 45 year-old woman who doesn't know what she wants to do when she grows up because she's never been allowed to do that."

At trial, Philip Eldred, a vocational rehabilitation counselor hired by Husband, testified to his evaluation of Wife. He administered tests, which showed that Wife was

at a high-school level in reading recognition and her spelling and arithmetic were only at the eighth-grade level. By looking to the Oasis Profile, Eldred testified that the salary range for Wife as an insurance agent in the Springfield, Missouri, area was $20,380 to $54,660 per year; however, Wife would only be able to earn on the high end of that range after obtaining an associate college degree or the equivalent in work experience. Eldred testified that Wife had the potential to be an insurance agent, but she still had licenses she would have to obtain before she would be considered an agent. Eldred agreed that in order to be more successful, additional education would be needed for Wife. While Eldred testified that Wife had the potential of earning $54,660 per year as an insurance agent, Wife countered that one of her current employers does not even make that amount, and he not only has a bachelor's degree but he has also been in the insurance business much longer than Wife.

Husband's business records indicate that 2002 was the lowest of five years with a gross income of $77,845; Husband's taxable income per his 2002 personal tax return was $43,574. In 2003, Husband's business, per the Schedule C, reflected a gross income of $202,821. Husband's taxable income was $66,642 per his 2003 personal tax return; the court assessed the amount of $66,500 as Husband's income. Husband's records reflect that the business income for the first ten months of 2004 increased to $216,083.09, for a monthly average of $21,608. Wife's records reflect payments to the business from just two sources to be $211,004 for the first nine months of 2004. Past register reports from Husband's business show that, on average, business expenses accounted for 57% of the gross income. The debt on the tractor-trailer awarded to Husband is paid by the business. Husband had exclusive access to the business income other than the proceeds from the sale of cattle and the closing of the sale barn, which the parties split equally.

The court found in its judgment that Wife was in good health and capable of full-time employment, but her employment opportunities were limited and her earning capacity at the time of trial was only $1,521 per month. The court found that Wife actually earned only $1,141 per month and her yearly income would be no more than $18,000. The court determined that Wife's reasonable monthly expenses were $5,047, so Wife has a monthly shortfall of $3,916. Wife's expenses included the payment of utilities in the home amounting to $479 a month, maintenance for her car, life, health, homeowners, and automobile insurance, and real estate, as well as all personal expenses. Wife's total average monthly expenses, as found by the court, were unchallenged by Husband. Wife lived in the marital home from the date of the separation with her son Nathaniel. Her other son, Joshua, was also living with her until he began his program in Nashville. Joshua spent only one night with Husband during the separation, and it appears Nathaniel has spent no substantial time with Husband.

Husband did not pay temporary maintenance to Wife during the separation, but after their separation, Wife had access to a joint account and withdrew $65,000. Wife claimed she took that money because she feared that Husband was planning to clean out the accounts and "run off" with his girlfriend. Additionally, Wife received $19,290.57 of the proceeds from a calf and cattle sale, for a total of approximately $85,000 available to Wife. It was undisputed at trial that none of the $85,000 was in existence at the time of trial and there were no allegations that the funds were secreted or squandered.

Husband did not produce an expense statement at the time of the proceedings, but his only claimed debt is a balance due on a Kenworth tractor-trailer in the amount of $87,129, which is used for his business. Since the separation, Husband has paid for the sons' car insurance, health insurance, and college expenses. Husband began paying child support in March of 2004 in the amount of $1,000 per month. Other than those payments, Husband did not produce any documentation of or indicate that he has any other substantial financial burdens.

The trial court found that Husband and Wife accumulated net assets of $698,889. In the initial division of marital assets, Husband received $533,821 in marital property and Wife received $165,068. Husband was granted a greater share in the marital assets because the court found that the "Reberry Place" was acquired late in the marriage as a gift from Husband's parents. In order to equitably compensate Wife, Husband was required to pay Wife the amount of $134,000. In calculating the value of Wife's marital property, the court included the $85,000 that Wife was forced to expend in the two years she was separated from Husband. Wife's marital property included an Edward D. Jones account, four Prudential accounts, and a Farm Bureau account with a combined worth of $30,762. Three of those accounts were in the names of her three sons, and one other was in the name of Husband. The court further added in the value of Wife's marital property three life insurance policies in the names of her three sons, for a total of $3,052. The majority of Wife's property award was personal property items.

The court awarded Wife $1,000 per month in non-modifiable maintenance for two years, commencing on February 1, 2005. Husband was further ordered to pay $851 a month in child support to be paid directly to the children. The court also ordered Husband to pay Wife $7,500 for a portion of her $25,000 in attorneys' fees.

Wife brings four points on appeal, all having to do with the award of maintenance. In her first three points, Wife claims the court abused its discretion, first by awarding an inadequate award of $1,000 per month; second, in limiting the maintenance award to two years without sufficient evidence of an ability to be self-supporting within two years; and, third, making the maintenance award non-modifiable. In point four, Wife challenges the denial of temporary maintenance during the pendency of the dissolution. We find merit to Wife's first three contentions, deny her fourth point, and affirm the judgment as modified.

 A trial court has broad discretion in determining the amount of maintenance to be paid and the duration of the maintenance award. *Craig–Garner v. Garner,* 77 S.W.3d 34, 39 (Mo.App. E.D.2002). If the trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable so as to shock the sense of justice and indicate a lack of careful deliberation, then the trial court has abused its discretion. *Michel v. Michel,* 142 S.W.3d 912, 917–18 (Mo.App. S.D. 2004). Furthermore, there is a preference that maintenance awards be modifiable because the issues of maintenance in the future are uncertain because maintenance is based on need. *Id.* at 925; *In re Marriage of Boston,* 104 S.W.3d 825, 834 (Mo. App. S.D.2003); *Sweet v. Sweet,* 154 S.W.3d 499, 508 (Mo.App. W.D.2005). If future events that are relevant to the issue of maintenance are uncertain, then the award should be modifiable. *Michel,* 142 S.W.3d at 925. This preference for modifiability exists because an award of maintenance is founded on need, and therefore

maintenance should extend so long as that need is present. *Cates v. Cates*, 819 S.W.2d 731, 735 (Mo. banc 1991). Because maintenance is based upon need, such future events will in fact generally be uncertain, thus stemming the preference for modifiable maintenance. *In re Marriage of Clift*, 108 S.W.3d 197, 202 (Mo.App. S.D.2003).

### Points I, II, & III

■ Because the first three points are inter-connected and heavily dependent upon the facts of the case, we shall discuss them together. The trial court is allowed to order maintenance after it first determines that the spouse seeking maintenance lacks sufficient property to provide for her reasonable needs and is unable to support herself through appropriate employment. Section 452.335.1.[2] The trial court made the express determination that Wife lacked sufficient property to provide for her reasonable needs and was unable to support herself through appropriate employment. That finding is not challenged on appeal.

After the court determines that a spouse qualifies for maintenance, the trial court must determine a just amount and the duration of maintenance after considering the following factors:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

Section 452.335.2. We look to each of the factors to assist in determining whether the court abused its discretion in its award of maintenance.

### Factor 1

First, the court, in its division of property, awarded to Husband all of the real property, which was unencumbered, with a combined value of $455,000, as well as virtually all of the automobiles and trucks, including the truck used for his business, and stock and securities worth over $20,000. The total value of his property was $533,821. The only debt was the business debt for the tractor-trailer. Wife was awarded one automobile, which had $16,343 debt on it; a time-share unit in Branson; several investment accounts worth $30,762, the majority of which were not in her name; three life insurance policies with the children as the insureds totaling $3,052; and her wedding rings with a value of $10,125.

---

**2.** All references to statutes are to RSMo 2000, unless otherwise specified.

■ Although listed as a cash asset on the property distribution, Wife does not have access to $85,000 of the $165,068 in property awarded to her because it was used to fund her living expenses during the pendency of the action.[3] Even though the court specifically found Wife's monthly expenses to be reasonable at $5,047 per month with a shortfall of $3,916 per month, the court must not have considered that Wife expended the $85,000 to offset her total expenses of $121,128 during the twenty-four month separation.[4] Of course, the court was allowed to consider the use of marital assets during the pendency of the action, but

[A]bsent restraint from a court, either spouse is entitled to spend marital assets for necessaries such as living expenses. '[F]unds used for reasonable living expenses are not to be included in the division of marital property.' *Petties v. Petties*, 129 S.W.3d 901, 906[4] (Mo.App.2004). As spent funds no longer exist at the time of property distribution, a court cannot consider such in the division of marital property unless the court concludes that a spouse squandered the asset. *Id.* at 906.

*Ashlock v. Ashlock*, 154 S.W.3d 419, 422 (Mo.App. S.D.2004). What is important to our consideration of the available assets to meet Wife's reasonable needs is that $85,000 of the property award is not available to meet her reasonable expenses.[5]

The court recognized Wife had a shortfall of $3,916 per month, but claimed once Wife moved from the marital home her monthly expenses would be reduced. In fact, Wife's monthly expenses as listed did not show a house payment because the Wife was living in the marital home, which had no mortgage. Her expenses are likely to increase with a house payment unless she uses all of the cash offset paid by Husband to buy a home. Moreover, Wife was not awarded any child support even though one child resided with her. Clearly, the first factor weighs heavily in favor of Wife for an increased award of maintenance.

**Factor 2**

The court awarded Wife maintenance for two years, presumably to acquire sufficient education or training to enable her to find appropriate employment; however, there was virtually no evidence that Wife would be able to find appropriate employment or acquire sufficient education or training within two years. The court correctly noted Wife's educational deficiencies would limit her employment opportunities. Wife has a high-school education; however, the expert witness, hired by Husband, testified that though Wife could read at the high-school level, her spelling and arithmetic were at the eighth-grade level. Wife discovered that most insurance agents have an associate or bachelor's college degree in business or equivalent work experience. The expert testified the salary range for Wife, if she became an insurance agent, ranged from $20,380 to $54,660 per year in the Springfield area; however, even the salary of Wife's employer was not at the top end of the range.

---

3. Although Wife does not appeal the property distribution, we discussed the award of the $85,000 to Wife only as it relates to the issue of assets available to Wife to meet her current reasonable needs.

4. The parties separated in January, 2003, and the judgment was entered in January, 2005.

We arrive at our total by multiplying twenty-four months by $5,047.

5. Husband had access to income of at least that amount, but the court did not attribute any income to him in the property distribution.

The trial court imputed earnings to Wife of $1,521 per month, or $18,252 per year, based upon her hourly rate of $8.50 at forty hours per week. In fact, Wife does not work forty hours per week, and has never earned income at a forty-hour per week job; she is currently able to obtain part-time employment from two different employers, for a total of thirty-two hours per week. The limitation on her earnings was at Husband's insistence as he felt she should be home with the children. At one point in the marriage, Wife, who did the company's books at no pay, was put on Husband's business payroll for tax purposes; however, the money was actually returned to the company. That practice was stopped because of concerns that Husband's social security was not accumulating. Throughout the marriage, Wife's average earnings per her social security statement were minimal and no earnings were reported during the years 1996–2001. In short, at forty-five years of age and being out of the workforce for twenty years, Wife has no viable work history.

Wife has the title of licensed sales associate in her current jobs, but she is not an insurance agent. In order to become an insurance agent, Wife would have to obtain additional licenses and a college education, which almost all agents have, in order to sell financial securities. Additionally, she would need to be approved by the insurance company prior to becoming an agent. It is pure speculation whether and when Wife will be able to become an insurance agent or become self-supporting. The second factor of section 452.335.2 weighs in favor of a modifiable award of maintenance for an unlimited duration.

### Factor 3

The court must consider the earning capacity of each spouse. The court, as we noted under the second factor, specifically noted Wife's limited education and inability to earn income. Additionally, it was admitted by both parties that Wife was a homemaker at the request of Husband and did not have substantial work history. It was also admitted by Husband that he did not participate in any household chores, that Wife virtually did any and all household and childcare chores. On the other hand, Husband used his twenty-plus years during the marriage to build and maintain his business acumen, free from the responsibilities of caring for the household. He had no health issues and was able to produce substantial income.

Regarding the duration of marriage factor, additional significance attaches thereto where one spouse, while taking care of the home and rearing the children born of the marriage, forgoes development of his or her career and the attendant advances and salary increases which could reasonably be expected during that period of time; and where the other spouse is free to advance his career or business and to enjoy the benefits therefrom.

*L.A.L. v. L.L.*, 904 S.W.2d 50, 54 (Mo.App. E.D.1995) (citing *Weiss v. Weiss*, 702 S.W.2d 948, 956 (Mo.App. W.D.1986)). Factor three weighs in favor of an increased award of modifiable maintenance of unlimited duration.

### Factor 4

The court specifically noted the relatively high standard of living established during the marriage. The parties paid in full for an expensive home eleven years after building it; Husband drove a new car every one to two years. The parties were able to invest in securities and life insurance policies. Although the court did not have to award maintenance in an amount comparable to the standard of living established during the marriage, the standard of living in a longer marriage can provide

evidence of what the parties determine are their reasonable needs. *In re Marriage of Torix*, 863 S.W.2d 935, 941 (Mo.App. S.D. 1993). An increased award is supported by the standard of living the parties enjoyed during the marriage.

### Factor 5

As for the obligations and assets, including marital and separate property of each party, Husband was ordered to pay the indebtedness on his business tractor-trailer but had virtually no other liability. In fact, that indebtedness was subtracted from Husband's gross income to arrive at the court's designated net income assessed to Husband. Therefore, Husband had no indebtedness whereas Wife's indebtedness included the payment on her car, plus credit card debt of over $11,000, and a shortfall of attorneys' fees in the amount of at least $18,000. Husband has unencumbered assets of the two properties, as well as the only income-producing asset of the marriage. The fifth factor weighs in favor of Wife receiving an increased award of maintenance.

### Factor 6

As to the duration of the marriage, this marriage lasted twenty-two years. It was a successful marriage until Husband chose to leave the marriage after conducting a two-year affair with a co-worker. The sixth factor weighs in favor of an increased award of maintenance for an unlimited duration.

### Factor 7

Wife was forty-five years of age at the time of the trial. Though she had no substantial work history or education, she was in relatively good health with the ex-

ception of a lump in her breast, which her doctor was watching closely. The seventh factor justifies an award of modifiable maintenance in the event that Wife should become self-supporting.

### Factor 8

The court must consider the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Husband did not submit an Income and Expense Statement, therefore the court did not consider Husband's actual living expenses; evidence does not indicate that Husband had any expenses other than those ordered by the court. He was living with his mother during the separation, was awarded substantial assets, and has virtually no indebtedness. A review of the records certainly indicates that Husband has the ability to deduct the majority of his living expenses to his business. The trial court ascribed income to Husband in the amount of $66,500, based upon his 2003 personal income tax return, although his business income in 2003 was $202,821. Husband had available, at a minimum, $5,000 per month, which does not include any investment income, to meet his reasonable expenses.

The court-ordered payments included child support of $851 to be paid *directly to the children*, one hundred percent of the children's college expenses,[6] and one hundred percent of the health care costs. All of the children would be emancipated within six months to a year after the hearing. Furthermore, a review of Husband's exhibit of net trucking income indicates he included one-time expenses for his attorney in the amount of $18,000. Husband

---

6. There was no evidence concerning the amount of those expenses and Husband agreed to pay them.

had ample money from the property awarded to him as well as his current income to meet his regular expenses and pay additional maintenance.

### Factors 9 & 10

Finally, as to the conduct of the parties, the court specifically found that Husband had an affair the last two years of the marriage. The evidence supports a finding that Husband provided gifts, trips and loans to his paramour. Interestingly, the court did not add any of the money spent on Husband's girlfriend to Husband's side of the ledger of the marital estate even though it did attribute money to Wife the money spent on living expenses. There was no evidence of any conduct on the part of Wife to justify a limited award; we can find no other reason for the limited award. The last factor supports a finding of an increased maintenance award.

We find *Torix*, 863 S.W.2d at 937, to be apropos. In a fact situation quite similar to this case, Wife was awarded marital assets in the amount of $348,713, and Husband was awarded net assets of $318,949, including the interest in three family businesses. *Id.* at 937. Wife, who had a GED, worked for a short time in the family business answering the phone, doing clerical work, and getting parts; however, for the majority of the time she was not employed outside the home during the twenty-four year marriage. *Id.* Husband claimed that, after paying all expenses, he only realized $49,000 in a six-month period. *Id.* at 940. Wife's monthly expenses were approximately $2,800 per month. *Id.* at 940–941. Although the trial court awarded Wife $1,000 per month in maintenance, we reversed and the judgment was increased to modifiable maintenance of $2,000 per month. *Id.* at 941.

Likewise, in this case, we find the award of maintenance to be inadequate and an abuse of discretion. Based on all the factors pursuant to section 452.335.2, Wife demonstrated needs greater than the $1,000 per month and Husband had the ability to pay an increased award. We find the appropriate maintenance award to be $2,000 per month.

■ An appellate court, which believes the trial court has abused its discretion, may enter the judgment the trial court should have entered. Rule 84.14.[7] *See e.g., Lee v. Gornbein*, 124 S.W.3d 52, 61 (Mo.App. W.D.2004); *Bolch v. Bolch*, 78 S.W.3d 769, 773 (Mo.App. W.D.2002); *Crawford v. Crawford*, 986 S.W.2d 525, 533 (Mo.App. W.D.1999); *Creech v. Creech*, 992 S.W.2d 226, 230–31 (Mo.App. E.D.1999); *Clarke v. Clarke*, 983 S.W.2d 192, 196 (Mo.App. E.D.1998); *Friedman v. Friedman*, 965 S.W.2d 319, 325 (Mo.App. E.D.1998); *L.A.L.*, 904 S.W.2d at 55; *In re Marriage of Myers*, 879 S.W.2d 736, 738 (Mo.App. S.D.1994); *Torix*, 863 S.W.2d at 941. Accordingly, the award of maintenance is reversed and the judgment is modified to increase the maintenance award to a total of $2,000 per month, effective as of the date of the judgment, January 28, 2005.

■ Likewise, it was an abuse of discretion to make the award of maintenance non-modifiable and of only two years duration. Limited duration maintenance awards imply that the recipient will be self-supporting at the end of the designated time period. *Hernandez v. Hernandez*, 872 S.W.2d 161, 163 (Mo.App. W.D.1994). There was no evidence that Wife would be self-supporting at the end of two years. Wife had a limited education, she had virtually no paid work history, and she had not even enrolled in any classes to make her self-sufficient. The evidence was

**7.** All rule references are to Missouri Court Rules (2005), unless otherwise specified.

purely speculative whether Wife could become a licensed insurance agent and, if she could, what her potential income would be. It was also speculative whether Wife, who was forty-five years of age at the time of trial, could work a full-time job and complete a degree in the two years the court gave her to do just that. It was an abuse of discretion to limit maintenance to two years.

Furthermore, it was an abuse of discretion that the maintenance order be non-modifiable. As we have previously noted, we are unable to conclude that there are no circumstances under which a non-modifiable order would be authorized; however, we perceive that they would be exceedingly rare. *Boston,* 104 S.W.3d at 835; *see also, Sweet,* 154 S.W.3d at 508–09 ("We can be practically certain that at some point in the future, the [maintenance amount] will be an inappropriate amount as to some party or both parties.") We, therefore, reverse the two-year limitation and the designation that the maintenance award was non-modifiable. We order that the award be designated as modifiable and not be limited in duration.

### Point IV

As noted herein, in the two years that the case was pending, Wife spent marital assets in the amount of $85,000 to meet her reasonable needs. Wife argues that she should have been awarded temporary maintenance because she should not have been forced to use property before being entitled to receive temporary maintenance. Again, we note that the trial court has broad discretion in determining issues regarding maintenance, including temporary maintenance. *Tisone v. Tisone,* 881 S.W.2d 647, 648 (Mo.App. E.D.1994).

We conclude the trial court did not err in failing to award Wife temporary maintenance in view of the fact that Wife had access to the use of property during the pendency of the action. *See Ashlock,* 154 S.W.3d at 422 (holding that it was not error to deny temporary maintenance when Wife had access to substantial funds to meet her needs). This is not to say that courts should force the parties to spend marital assets for necessary expenses; however, in this case, by the time the trial court had to decide the issue of temporary maintenance, the parties had chosen their course. Although Husband contends he refused to pay any temporary maintenance because Wife had the use of the marital assets and Wife contends she used the marital assets because Husband refused to pay any temporary child support or maintenance, the trial court was presented with a *fait accompli.* We do not find an abuse of discretion in the failure to award retroactive maintenance to the date of the filing of the motion.

The award of maintenance is reversed and the case remanded. The trial court is ordered to enter judgment awarding maintenance, effective January 28, 2005, in the amount of $2,000 per month, which may be modified by court order upon proper motion and evidence, but otherwise shall have no fixed termination date. In all other respects, the judgment is affirmed. The case is remanded with directions to the trial court to enter judgment consistent with this opinion.

PREWITT, P.J., PARRISH, J., concur.